IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

AUTOMOTIVE EXPERTS, INC.,     )
                         )
      Plaintiff,          )
                         )     NO. 3:19-cv-00982
v.                     )     JUDGE RICHARDSON
                         )
KEITH KALLBERG, et al.,     )
                         )
      Defendants.      )

## MEMORANDUM OPINION

Pending before the Court is Plaintiff's Motion for Summary Judgment. (Doc. No. 58, "Motion"). Defendants have responded. (Doc. No. 70). Plaintiff has replied. (Doc. No. 72). The Motion is ripe for review.

For the reasons discussed herein, the Court will deny the Motion.

## FACTUAL BACKGROUND[1]

---

[1] Unless otherwise noted, the facts in this section are taken from facts in the parties' Responses to Statements of Undisputed Facts (Doc. Nos. 71, 73). Unless indicated otherwise, the facts set forth in this section are undisputed. Thus, the facts set forth here are either undisputed or specifically identified as disputed.

Additionally, the Court notes that Plaintiff expressed concern in its Reply regarding several of Defendants' answers that, according to Plaintiff, "fail to establish factual issues, misrepresent facts, and fail to provide proper evidentiary citations." (Doc. No. 72 at 2). The Court herein has noted where it has found the response to a statement of fact unsupported or lacking. In these instances, the Court has explained why it considers the fact to be disputed or to be undisputed.

The Court additionally notes that the Statements of Undisputed Facts in this case are at times unclear or appear to be lacking relevant information. The Court has noted herein places where it is making an inference based on the Statements of Undisputed Fact or otherwise filling in the gaps left by the parties in a manner the Court is confident is appropriate.

1

Kallberg Industries, LLC, a Tennessee limited liability company, ("Kallberg Tennessee")[2] was incorporated on October 17, 2017 and was administratively dissolved on August 6, 2019. (Doc. No. 71 at ¶ 1). On or around October 1, 2017, Plaintiff's representative, Michael Kunkel, received a call from one of Kallberg Tennessee's principals, Defendant Matthew Kallberg. (*Id.* at ¶ 2). Defendant Matthew Kallberg requested equipment and personnel be sent to Puerto Rico to assist in relief efforts after Hurricane Maria (the "mission"). (*Id.* at ¶ 3). Kallberg Industries, LLC, a Florida limited liability company ("Kallberg Florida")[3] was engaged to service existing generators that had previously been installed as back-up generators in Puerto Rico following Hurricane Marie. (*Id.* at ¶ 13). One of Kallberg Florida's owners, Michael Kallberg, requested as many generators, technicians, and storm-ready work trucks as could be provided. (*Id.* at ¶ 14). Plaintiff supplied eight utility trailers, five 250 gallon used storage containers, five 250 gallon fresh fuel/clean oil tanks, 52 fuel caddies, eight trucks, and nine oil pumps. (*Id.* at ¶ 4). Plaintiff also supplied numerous mechanics. (*Id.* at ¶ 17).

Kallberg Tennessee utilized the equipment and submitted invoices to the prime contractor (who presumably was a client of either Kallberg Tennessee or Florida, though this is unclear from the record) and received payment. (*Id.* at ¶ 27). Kallberg Tennessee benefited from the use of the equipment. (*Id.*). The parties dispute how much compensation Plaintiff should receive per day for

---

[2] Defendants refer to Kallberg Tennessee as "Kallberg Industries" throughout briefing. Kallberg Tennessee is not a Defendant to this action.

[3] Kallberg Tennessee is a subcontractor of Kallberg Florida. (Doc. No. 71 at ¶ 24). Kunkel claims that he did not know that there were two distinct Kallberg entities (Tennessee and Florida), and believed himself to be working for and providing services to Kallberg Florida (owned by Michael Kallberg). (*Id.* at ¶ 25). Kunkle states that he did not know about Kallberg Tennessee until he was sued in a declaratory judgment action in Florida by Kallberg Tennessee. (*Id.* at ¶ 26). Defendants dispute that Kunkel was unaware of this arrangement. (*Id.*). Neither Kallberg Florida nor Michael Kallberg is a Defendant in this action.

each mechanic. (*Id.* at ¶ 16). After the mechanics arrived, Defendant Matthew Kallberg called Kunkel and advised that Kallberg Tennessee wished to pay all the mechanics directly (rather than paying Kunkel,[4] who might then pay the mechanics, in total, less than the full amount Kunkel had received from Kallberg Tennessee). (*Id.* at ¶ 18). The parties dispute the amount of profit that Kunkel had anticipated making by paying the mechanics less than Kallberg Tennessee would pay Kunkel, and what arrangements were made to compensate him for this loss. (*Id.* at ¶ 19). It is unclear from the Statement of Facts whether Kunkel in fact suffered any loss.

On January 1, 2018, Kallberg Tennessee terminated Kunkel (and, presumably, by extension Plaintiff). (*Id.* at ¶ 29). At the time Kunkel was terminated, Kallberg Tennessee had not paid Plaintiff for the utilization of Plaintiff's equipment. (*Id.* at ¶ 34). It appears undisputed that Kallberg Tennessee continued to use the equipment for some time thereafter, though it is unclear when Kallberg Tennessee ceased using the equipment.[5] Whether or not Kunkel was immediately (as of January 1, 2018) able to access his equipment is disputed. (*Id.* at ¶ 32). When he did inspect the equipment, Kunkel discovered that many of the trailers were covered in oil and waste, and the vehicles had to be cleaned before they were shipped to Florida because they would not be accepted for shipment or admitted into the United States in that condition. (*Id.* at ¶ 33).

---

[4] Though the Undisputed Statement of Facts indicates that Kunkel would have been paid, it seems likely that Plaintiff was the entity that would have been receiving payment.

[5] Defendants dispute that they used Plaintiff's equipment at all past the termination date. (*Id.* at ¶ 30). However, Defendants did not dispute that in mid-January 2018 they no longer desired to utilize Plaintiff's equipment (at least several weeks after the termination date). (*Id.* at ¶ 31). And they additionally do not dispute that equipment was utilized by Kallberg Tennessee from October 11, 2017 through February 15, 2018, when it was released to Plaintiff in Florida (approximately a month and a half after the termination date). (*Id.* at ¶ 35). Therefore, it is unclear if and when Defendants stopped using the equipment after the termination date, though it does seem (contrary to one of Defendants' assertions) that they continued using the equipment for some period of time after the termination date.

3

On January 2, 2018, Plaintiff requested payment for its equipment and referred employees. (*Id.* at ¶ 36). On October 9, 2018, Kallberg Tennessee tendered a check to Plaintiff as payment for the utilization of Plaintiff's equipment. (*Id.* at ¶ 38). At the time Kallberg Tennessee tendered the check, it also filed a declaratory judgment action against Plaintiff and Kunkel in Florida. (*Id.* at ¶ 39). On December 4, 2019, an Amended Final Judgment[6] was entered against Kallberg Tennessee for the total amount of $1,735,025.00.[7] (*Id.* at ¶¶ 40, 83). Though the amount owed remains disputed as the matter is currently on appeal, the parties agree that Defendants were aware that Kallberg Tennessee owed Plaintiff some amount of payment for its provision of equipment and labor. (*Id.* at ¶ 41).[8] Defendants Keith Kallberg, Matthew Kallberg, and Kathryn Kallberg made numerous attempts to calculate the amount owed to Plaintiff prior to January 15, 2018. (*Id.* at ¶

---

[6] Presumably, if there was an Amended Final Judgment, there was also an original Final Judgment. Neither judgment appears to be included in the record, though the Court does have a copy of the Findings of Fact and Conclusions of Law. (Doc. No. 61-5). It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record).

[7] This amount includes both the outstanding principal and the total amount of accrued post-judgment interest (which Defendants dispute, as the matter is on appeal). (Doc. No. 71 at ¶¶ 103, 104. Plaintiff contends (in response to one of Defendants' statements of fact) that "[a]lthough Kallberg Tennessee filed an appeal, it did not post a bond or obtain a stay and thus the Defendants are collaterally estopped from contesting the amount owed." (Doc. No. 73 at ¶ 6). However, Plaintiff provides no factual or legal citation to support this claim, and Plaintiff does not address the claim in its briefing. Regardless, the exact amount owed is not material to the analysis of the claims herein, as the parties do agree that some money was owed by Kallberg Tennessee to Plaintiff.

[8] On November 5, 2019—after issuance of the Final Judgment but before issuance of the Amended Judgment—Kallberg Tennessee tendered a check in the amount of $162,937.90. (Doc. No. 71 at ¶ 101). On December 16, 2019, pursuant to a Writ of Garnishment, Plaintiff recovered $60,986.77 from Bank of America. (*Id.* at ¶ 102).

4

42). The balance in Kallberg Tennessee's bank account on January 1, 2018 was $37,877.64. (*Id.* at ¶ 86). It is undisputed that in January 2018, Kallberg Tennessee was aware that Plaintiff believed Kallberg Tennessee owed it approximately $1.8 million. (*Id.* at ¶ 82).

Despite knowing that it owed money to Plaintiff—in some disputed amount—Kallberg Tennessee made numerous conveyances in 2017-2018. (*Id.* at ¶ 43). Defendants do not dispute that the following chart accurately reflects the transfers made from Kallberg Tennessee to Defendants Keith Kallberg and Lisa Kallberg:

| 10/27/2017 | Transfer | $16,000.00 |
|---|---|---|
| 11/20/2017 | Transfer | $18,000.00 |
| 2/12/2018 | Wire | $281,650.00 |
| 2/22/2018 | Transfer | $360,473.00 |
| 4/3/2018 | Transfer | $13,817.86 |
| 4/4/2018 | Transfer | $294,453.00 |
| 4/9/2018 | Transfer | $13,817.86 |
| 4/20/2018 | Transfer | $6,908.93 |
| 4/25/2018 | Wire | $747,667.00 |
| 4/27/2018 | Transfer | $6,908.93 |
| 6/8/2018 | Transfer | $9,100.00 |
| 6/22/2018 | Transfer | $9,100.00 |
| 6/22/2018 | Transfer | $9,100.00 |
| 7/2/2018 | Transfer | $9,100.00 |
| 7/6/2018 | Transfer | $9,100.00 |
| 7/16/2018 | Transfer | $9,100.00 |

5

| | | |
|---|---|---|
| 7/20/2019 | Transfer | $9,100.00 |
| 7/27/2018 | Transfer | $9,100.00 |
| 8/3/2018 | Transfer | $9,100.00 |
| 8/10/2018 | Transfer | $1,900.00 |
| 8/15/2018 | Transfer | $7,200.00 |
| 8/17/2018 | Transfer | $9,100.00 |
| 8/27/2018 | Transfer | $9,100.00 |
| 9/4/2018 | Transfer | $9,100.00 |
| 9/7/2018 | Transfer | $9,100.00 |
| 9/14/2018 | Transfer | $9,100.00 |
| 11/20/2018 | Wire | $100,000.00 |
| 04/29/2019 | Wire | $20,000.00 |
| 06/12/2019 | Wire | $225,000.00 |
| **TOTAL** | | **$2,239,196.58** |

(Doc. No. 60 at 6; Doc. No. 71 at ¶ 44). It is undisputed that Kallberg Tennessee also made the following transfers to Defendant Kathryn Kallberg:

| | | |
|---|---|---|
| 1/8/2018 | Wire | $7,901.14 |
| 2/12/2018 | Wire | $236,650.00 |
| **TOTAL** | | **$244,551.14** |

(Doc. No. 60 at 6; Doc. No. 71 at ¶ 45). Finally, it is undisputed that Kallberg Tennessee made the following transfers to Defendant Kallberg Emergency Management ("KEM"):

6

| | | |
|---|---|---|
| 3/9/2018 | Wire | $1,110,260.00 |
| 4/25/2018 | Wire | $252,333.00 |
| 9/21/2018 | Wire | $100,000.00 |
| 12/12/2018 | Transfer | $33,000.00 |
| 04/29/2019 | Wire | $20,000.00 |
| 06/12/2019 | Wire | $225,000.00 |
| **TOTAL** | | **$1,840,593.00** |

Therefore, it is undisputed that Kallberg Tennessee made transfers in 2017-2018 amounting to (at least) $4,324,340.72. (Doc. No. 71 at ¶ 47). Citing particular evidence, Defendant disputes the veracity of Plaintiff's statement that these transfers represented profit distributions, instead asserting that the transfers represented compensation.[9] (*Id.* at ¶ 68; Doc. No. 70 at 6-7). It is undisputed that Defendant KEM made numerous subsequent conveyances, despite knowing that money was owed to Plaintiff. (Doc. No. 71 at ¶ 48).[10] After the transfer of March 2018,[11] Kallberg Tennessee's ending balance was $4,453.53, and on March 14, 2018, Defendant Keith Kallberg

---

[9] Plaintiff correctly notes that Defendants' response to this statement cites to pages that Defendants have failed to put into the record. Docket Number 70-7 does not contain pages 99-100 of Defendants' expert's report. However, the Court considers this to be in dispute because Defendants have cited to additional evidence in their Response brief indicating that this fact is in dispute, as will be discussed later in this opinion.

[10] These conveyances are listed in detail on pages 8-12 of Docket Number 60.

[11] Plaintiff indicates that there were multiple transfers in March 2018, but the charts included above indicate that there was only one such transfer. It is also apparent that some amount of money was coming into the account during the same time period, though this is unclear from the record.

7

had to lend $25,000 back to Kallberg Tennessee (a few days after the $1.1 million wire transfer to Defendant KEM). (*Id.* at ¶¶ 84, 85).[12]

During the time of the transfers, Defendants Keith Kallberg and Matthew Kallberg received paid wages of $400 a day plus per diem. (*Id.* at ¶¶ 74, 76). After ending the participation in the mission, Defendant Keith Kallberg was paid wages in excess of $1,000 a day. (*Id.* at ¶ 75). During the time period he was paid by Kallberg Florida, Matthew Kallberg was paid around $9,100 per week. (*Id.* at ¶ 78). Kallberg Florida also made payments to Defendant KEM, even though Defendant KEM provided no services for Kallberg Florida. (*Id.* at ¶¶ 77, 79). The second and third sentences of this paragraph seem potentially to be in conflict with the first sentence. Yet for whatever reason, none of the statements comprising these three sentences is disputed. However, it is unclear to the Court whether (as seems likely) the two referenced time periods overlap or to what extent the referenced payments overlap (or do not overlap) with the other payments listed in this paragraph and with those transfers discussed above.

The parties dispute many of the details surrounding Kallberg Tennessee's bookkeeping practices, such as whether Kallberg Tennessee knew what assets and liabilities it had. (*Id.* at ¶¶ 63,

---

[12] Defendants purport to dispute this fact, but their asserted basis for disputing it is actually nonresponsive to this fact. To Plaintiff's statement asserting this fact, Defendants responded that "this fact remains in dispute because there is conflicting expert testimony regarding Kallberg Tennessee's solvency and ability to pay debts as they came due. (Ex. 4 to Defendants Response, Plaintiff's Expert Report, p. 3-4; Ex. 7 to Defendant's Response, Dep. of Joel Glick, p. 22)." Defendants further respond that Kallberg Tennessee's "receivables and the value thereof is not determinable by reviewing its bank account balance sheet." (Doc. No. 71 at ¶¶ 84, 85). Even if accurate, Defendants' response here makes assertions, and cites portions of the record, that do nothing to refute the particular facts asserted here by Plaintiff. Thus, Defendants have failed to demonstrate to the Court a genuine dispute as to these facts as required by the Federal Rules of Civil Procedure and the Local Rules. *See* Fed. R. Civ. P. 56(c)(1); LR56.01(c)(3). Thus, the Court finds these facts undisputed.

64).[13] It is undisputed that Kallberg Tennessee did not maintain any books and records other than bank statements, that Kallberg Tennessee does not have any records that provide information as to its assets on the date of any distributions, and that Kallberg Tennessee does not have records that provide information as to its liabilities on the date of any distribution. (*Id.* at ¶¶ 65-67).

Plaintiff and Defendants dispute whether Kallberg Tennessee had any assets when it was formed. (*Id.* at ¶ 5). Kallberg Tennessee received money from Kallberg Florida, but it is disputed whether this money was a loan or advance against receivables. (*Id.* at ¶ 6). Because the nature of this money is disputed, the parties also dispute the amount of the loans, how the loans were tracked, how the loans would be repaid, whether they were personally guaranteed, and whether Kallberg Tennessee was able to compute loan repayments. (*Id.* at ¶¶ 7-9, 12). Plaintiff and Defendants also dispute whether Kallberg Tennessee incurred $3 million in debt to fund the mission to Puerto Rico. (*Id.* at ¶ 10). The parties dispute whether Kallberg Tennessee had receivables, and whether or not those receivables were of significant value.[14] (Doc. No. 73 at ¶ 4). Defendants assert that Kallberg

---

[13] Plaintiff argues that the exhibits cited by Defendants in making Defendants' response to Plaintiff's statement do not support Defendants' response. (Doc. No. 72 at 2). Though perhaps not directly responsive to Plaintiff's statements, Defendants' citations support the assertion that Kallberg Tennessee believed it possessed assets that Plaintiff disputes it possessed, which appears to be the overarching dispute regarding Kallberg Tennessee's bookkeeping practices.

[14] In their Response, Defendants describe the process of collecting receivables as such:

> The individuals assisting with Kallberg Industries organization and operations in Puerto Rico were paid out by Kallberg Industries almost exclusively from funds received at first from Keith Kallberg and later from Kallberg Industries Florida. (*Id.* at p. 37). This way, the labor, reimbursables, and the equipment portions of the O&M Mission were to be a direct pass-through from Kallberg Industries Florida to Kallberg Industries. (Exhibit 3, Expert Report of Joel D. Glick at p. 4; ECF No. 61-5 ¶27). Accordingly, each invoice Kallberg Industries Florida submitted to Louis Berger for services performed on the O&M Mission created an account receivable for the same amount on the books of both Kallberg Industries Florida and Kallberg Industries, regardless of whether those invoices were recorded on Kallberg Industries books or records. (Ex. 3 at p. 4).

Tennessee possessed the following receivables derived from invoices submitted by Kallberg Florida to Louis Berger U.S., Inc.:

| | |
|---|---|
| January 2018 | $5,124,647.00 |
| February 2018 | $1,072,598.00 |
| March 2018 | $88,779.00 |
| April 2018 | $1,726,695.00 |
| May 2018 | $915,225.00 |
| June 2018 | $446,199.00 |
| July 2018 | $4,578.00 |
| August 2018 | $51,402.00 |

(Doc. No. 70 at 3).

(Doc. No. 73 at ¶ 8).[15] Because of these receivables, Defendants assert that Kallberg Tennessee was solvent and able to pay its debts at all relevant times. (*Id.* at ¶ 9).[16]

The parties agree that Kallberg Tennessee's 2018 tax return contains several pieces of information about Kallberg Tennessee: 1) that it distributed $3,494,572.00 in profits to its members, 2) that it had only $37,878.00 in assets as of December 31, 2017, 3) that it did not include any obligation to Plaintiff in its balance sheet as of December 31, 2017, and 4) that it listed $37,878.00 in cash as its only asset as of December 31, 2017. (Doc. No. 71 at ¶¶ 69-72).[17]

The Amended Complaint[18] brought counts of: I) fraudulent conveyance under Tenn. Code Ann. § 66-3-305(a)(1), II) Fraudulent Conveyance under Tenn. Code Ann. § 66-3-305(a)(2), III)

---

[15] Plaintiff disputes the existence of these receivables by stating:

> Defendants' record citations do not support this statement. Furthermore, Defendants have not and cannot produce admissible evidence to support the allege facts. Kallberg Tennessee provided services at the O&M Mission from early October 2017 through February 28, 2018. (Ex. 2, p. 15). The Defendants agreed that the fact is undisputed for the purpose of ruling on the Plaintiff's Motion for Summary Judgment. (Doc. 71, p. 16). Kallberg Industries, LLC, a Florida limited liability company ("Kallberg Florida") took over the mission after February 28, 2018. (Ex. 2, p. 15). Thus, Kallberg Tennessee did not possess receivables derived from invoices submitted by Kallberg Florida after February 28, 2018.

(Doc. No. 73 at ¶ 8). Despite stating that the record citation does not support this statement, the cited expert report contains the same information (though in simplified fashion) recited in the statement of facts. (Doc. No. 70-3 at 6). The rest of Plaintiff's dispute serves to create a dispute of fact, and to the extent that Plaintiff seems to be arguing that the expert report is not credible, the Court notes that it cannot weigh expert reports or evidence at the summary judgment stage (as the Court will discuss at length later in this opinion).

[16] Plaintiff attacks the credibility of the expert report in response to this fact. The Court will discuss at length later in this opinion that it cannot weigh expert reports or evidence at the summary judgment stage.

[17] However, Defendants note that "Kallberg Industries' [Kallberg Tennessee's] receivables and the value thereof is not determinable by reviewing its tax returns." (Doc. No. 71 at ¶¶ 69-72).

[18] The Amended Complaint is the operative complaint in this matter. *See Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000).

11

Fraudulent Conveyance under Tenn. Code Ann. § 66-3-306(a), and IV) Fraudulent Conveyance under Tenn. Code Ann. § 66-3-306(b). Plaintiff brings these claims against the following Defendants: Keith Kallberg, Kathryn Kallberg, Matthew Kallberg, Lisa Kallberg, and KEM for a judgment for the value of the asset transferred or the amount necessary to satisfy Plaintiff's claim, whichever is less. Plaintiff has moved for summary judgment on all four counts.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the

12

summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018);

*Mangum v. Repp*, 2017 WL 57792 at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

As noted, Plaintiff brings its claims for fraudulent conveyance under four state statutory provisions: Tenn. Code Ann. § 66-3-305(a)(1), Tenn. Code Ann. § 66-3-305(a)(2), Tenn. Code Ann. § 66-3-306(a), and Tenn. Code Ann. § 66-3-306(b). Plaintiff asserts that it is entitled to summary judgment on all of these claims, and that the Court should find as a matter of law that the transfers constituted fraudulent conveyances. (Doc. Nos. 58, 59). The Court will first discuss the two claims brought under Tenn. Code Ann. § 66-3-305, before turning to the two claims brought under Tenn. Code Ann. § 66-3-306.

1. <u>Tenn. Code Ann. § 66-3-305</u>

Tennessee has adopted the Uniform Fraudulent Transfer Act ("UFTA"), which provides remedies to creditors when insolvent debtors fraudulently transfer assets to third parties. *See* Tenn. Code Ann. § 66-3-301 *et seq*.

Tenn. Code Ann. § 66-3-305 provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

14

(B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) In determining actual intent under subdivision (a)(1), consideration may be given, among other factors, to whether:

(1) The transfer or obligation was to an insider;

(2) The debtor retained possession or control of the property transferred after the transfer;

(3) The transfer or obligation was disclosed or concealed;

(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) The transfer was of substantially all the debtor's assets;

(6) The debtor absconded;

(7) The debtor removed or concealed assets;

(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tenn. Code Ann. § 66-3-305.

Under the UFTA, a "creditor" means a person who has a claim. Tenn. Code Ann. § 66-3-302(4). Neither party seems to dispute that Plaintiff is a creditor due to the previous declaratory judgment action finding in Plaintiff's favor. "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an

15

interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance. Tenn. Code Ann. § 66-3-302(12). As indicated above, Plaintiff and Defendants do not dispute that "transfers" were made to Defendants from Kallberg Tennessee. The statute additionally defines insolvency as:

> (a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.

> (b) A debtor who is generally not paying such debtor's debts as they become due is presumed to be insolvent.

> (c) A partnership is insolvent under subsection (a) if the sum of the partnership's debts is greater than the aggregate of all of the partnership's assets, at a fair valuation, and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

> (d) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this part.

> (e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Tenn. Code Ann. § 66-3-303.

A.  <u>Analysis of Tenn. Code Ann. § 66-3-305(a)(1) claim</u>

Plaintiff argues that it has shown that there is no genuine dispute that Defendants had actual intent to defraud Plaintiff, as shown by the eleven factors[19] in the statute, which (according to

---

[19] The undersigned here will reiterate what he has said previously about multi-factor tests generally:

> "The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *16 (M.D. Tenn. Aug. 28, 2020) (quoting Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable

16

endeavor") and Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations")). This reality tends not to bode well for the prospects of a multi-factor test to resolve a question as a matter of law at the summary judgment stage.

*Acosta v. Peregrino*, No. 3:17-CV-01381, 2020 WL 5995049, at *6 (M.D. Tenn. Oct. 9, 2020). Plaintiff points to some case law indicating that it should be able to prevail based on the presence of as few as five factors. (Doc. No. 72 at 2-3) (citing *United States v. Osborne*, 807 F. App'x 511, 524 (6th Cir. 2020) ("Although badges of fraud are not conclusive, a concurrence of several badges will always make out a strong case. The district court's conclusion that six badges of fraud apply (only one of which defendants dispute) is sufficient to establish [Defendant's] actual fraudulent intent." (quotation and internal citation omitted)) and *United States v. Key*, 837 F. App'x 348, 354 (6th Cir. 2020) ("[T]he district court's conclusion that five badges of fraud apply is sufficient to show that [the defendant] acted with actual fraudulent intent.")). Unlike in the cases cited by Plaintiff, Defendants here have disputed almost all of the eleven factors, and even if Plaintiff were to have shown that five of the factors weigh in its favor, there is no magic number of factors that dictates a ruling in Plaintiff's favor.

Sometimes such factors, to the extent that they cut in the creditor's favor, are called "badges" of fraud. One court has explained the terminology as follows:

> Whether a transfer is fraudulent is determined by the facts and circumstances of each case. Gibson's Suits in Chancery, (5th Ed.1955) § 1057, p. 328, states: "Inasmuch as frauds are generally secret, and have to be tracked by the footprints, marks, and signs made by the perpetrators, and discovered by the light of the attending facts and circumstances, these evidences are termed 'badges of fraud.' " (A more colorful description of these "badges" is found in *Floyd v. Goodwin*, 16 Tenn. 484: "[Fraud] therefore has to be ferreted out by carefully following its marks and signs; for fraud will, in most instances, though never so artfully and secretly contrived, like the snail in its passage, leave its slime by which it may be traced.") A "badge of fraud" is any fact that throws suspicion on the transaction and calls for an explanation. Where the circumstances of a transfer of property by a debtor are suspicious, the failure of the parties to testify or to produce available explanation or rebutting evidence is a badge of fraud. *Union Bank v. Chaffin*, 24 Tenn. App. 528, 147 S.W.2d 414 (1940).

*Macon Bank & Tr. Co. v. Holland*, 715 S.W.2d 347, 349 (Tenn. Ct. App. 1986).

17

Plaintiff) all weigh in favor of Plaintiff.[20] (Doc. No. 59). Defendants respond that 1) the Court need not even reach the factors enumerated in the statute, because they have raised a genuine dispute of material fact regarding their intent even without resort to the eleven factors, and 2) the eleven factors actually do not weigh in favor of Plaintiff. (Doc. No. 70).

Defendants are correct that, in dealing with a similar situation, another court in this circuit denied summary judgment to both parties without giving individualized assessment to the eleven factors, explaining as follows:

> The briefs filed by the debtor and the trustee deal extensively with the badges of fraud set out in § 66–3–305(b)[.] The trustee argues that enough badges of fraud exist to raise a presumption and require the debtor to produce evidence showing a lack of intent to harm creditors. The debtor's response is that she did not intend the transfer to harm her creditors . . .

> In cases such as this, the question is whether the debtor has a plausible reason for the transfer other than the intent to hinder, delay or defraud creditors. If so, the court is faced with a question of intent that must be decided at trial after hearing the debtor and other witnesses testify and judging their credibility. The debtor's explanation is sufficient to create a dispute as to her intent despite the badges of fraud asserted by the trustee. *United States v. Alfano*, 34 F.Supp.2d 827 (E.D.N.Y.1999); *Macon Bank and Trust v. Holland*, 715 S.W.2d 347 (Tenn.Ct.App.1986); *Neshewat v. Salem*, 365 F. Supp. 2d 508 (S.D.N.Y.2005); *Rowlands v. Fraser (In re Rowlands)*, 346 B.R. 279 (1st Cir. BAP 2006); 10B Charles A. Wright, et al., Federal Practice and Procedure § 2730. On the other hand, the badges of fraud asserted by the trustee are sufficient to create a dispute as to whether the debtor's explanation is true. The trustee and the defendant have thoroughly criticized each other's interpretation of the facts. Indeed, they have done such a good job that they have unintentionally cooperated in showing that neither side should be granted summary judgment on the question of whether the debtor had the actual intent to hinder, delay or defraud creditors. There is a genuine issue of material fact as to the debtor's intent.

---

[20] The Court finds that this is sufficient to shift the summary judgment burden to Defendants as the non-movants, as Plaintiff has pointed to not only the existence of evidence that supports its position that there was fraudulent intent, but also the absence of evidence contradicting its position. (Doc. No. 59 at 13). Plaintiff states that "there is no question that [Plaintiff's] claim arose before the transfers were made and the factors demonstrate that there is no factual issue that the Defendants intended to hinder, delay, or defraud [Plaintiff]." (*Id.*). Plaintiff then points to evidence indicating that there is an absence of evidence contradicting its position and evidence supporting its position in addressing the factors.

18

*In re Silvey*, 378 B.R. 186, 190 (Bankr. E.D. Tenn. 2007); *see also In re Walker*, 566 B.R. 503, 540 (Bankr. E.D. Tenn. 2017) (stating that "intent is not a subject that lends itself to a motion for summary judgment," finding that some badges of fraud were present, and ultimately concluding that "Defendants offer an alternative reason for the transfers and contend that they are willing to pay for the value that they received. Summary judgment is not appropriate for this count of the complaint"). The Court agrees that Defendants properly can show a genuine dispute of fact regarding actual intent by showing an alternative reason (other than fraud) for the transfers, without arguing each of the eleven factors discussed below.

Citing to depositions of the individual Defendants, Defendants argue that 1) the purpose of each of the allegedly fraudulent transfers was to compensate Defendants Keith Kallberg, Matthew Kallberg, and Kathryn Kallberg for services performed, and 2) at least one of the individual Defendants has denied ever having any intent to defraud Plaintiff.[21] (Doc. No. 70 at 17; Doc. No. 73 at ¶ 3). Plaintiff has asserted that the purpose of the transfers was instead to distribute profits. (Doc. No. 71 at ¶ 68; Doc. No. 70 at ¶ 6-7). The Court agrees with Defendants that they have indicated (via evidence) a plausible reason (other than fraud) for the transfers. Therefore, Defendants' countervailing assertion serves to create a genuine dispute of material fact, and so summary judgment is inappropriate.

Alternatively, many of the factors set forth in Tenn. Code Ann. § 66-3-305(b) are disputed, and so the Court would not grant summary judgment to Plaintiff even if it did reach the statutory

---

[21] In his deposition, Defendant Matthew Kallberg was asked: "Did you ever intend not to pay [Plaintiff]?" Defendant Matthew Kallberg responded: "No. We had full intention to pay everyone that we owed money to." (Doc. No. 70-2 at 12).

factors. It appears undisputed that the first[22] and tenth factors weigh in favor of Plaintiff, and the eleventh factor does not appear to be relevant. The Court will discuss later in this opinion the genuine dispute of material fact that exists as to factors eight and nine, which are requirements under the other statutory provisions at issue, § 66-3-305(a)(2) and § 66-3-306 (and not just factors bearing on Tenn. Code Ann. § 66-3-305(a)(1)). Therefore, the Court will briefly address factors two, three, five, six, and seven.[23]

1. Factor Two: Whether the Debtor Retained Possession or Control of the Property Transferred after the Transfer

Regarding the second factor, Plaintiff asserts that although Kallberg Tennessee did not "technically retain possession," the money could have been transferred back to Kallberg Tennessee at any time. (Doc. No. 59 at 15). Plaintiff notes that at one point, Defendant Keith Kallberg transferred $40,000 to Kallberg Tennessee. (*Id.*). Plaintiff does not cite any authority for its

---

[22] It is undisputed that Defendants Keith Kallberg, Kathryn Kallberg, Matthew Kallberg, KEM, and Lisa Kallberg each qualifies as an "insider" (as defined in Tenn. Code Ann. § 66-3-302) for purposes of Tenn. Code Ann. § 66-3-305(b)(1). (Doc. No. 71 at ¶¶ 54-58). Defendants Matthew Kallberg and Kathryn Kallberg are also subsequent transferees for purposes of Tenn. Code Ann. § 66-3-309. (*Id.* at ¶¶ 59, 60). Plaintiff included statements indicating this information in its Undisputed Statement of Facts. (Doc. No. 71). Though a statement of facts is not the usual place to decide that there is no dispute of a legal concept, Defendants also raised no arguments regarding this factor in their Response. Therefore, the Court does not believe that this factor is in dispute.

[23] As explained above, there is no magic number of factors that need to cut in a creditor's favor for it to prevail under Tenn. Code Ann. § 66-3-305(a)(1). In the Court's view, there likewise is no magic number of factors as to which a creditor, when moving for summary judgment, must remove any genuine issue as to whether the factor cuts in its favor. This reality ultimately hurts a creditor-movant because the court must construe the evidence, and inferences to be drawn from the evidence, against the summary judgment movant—meaning, in pertinent part, that the Court must, if anything, err on the side of the non-movants with respect to the number of factors as to which there is a genuine issue for trial, recognizing the possibility that the non-movants could prevail under these factors on balance even if they prevail on relatively few individual factors. Given the subjective nature of multi-factor tests, as discussed above, it should come as no surprise that it would generally be difficult for the Court, even if presented with relatively few factual disputes as to the application of the factors, to be able to pronounce as a matter of law that the factors collectively weigh in the creditor's favor.

20

proposition that a debtor should be treated as "retaining possession" within the meaning of the second factor, despite not "technically" retaining possession, based on mere speculation that the transferred property could have been transferred back to the debtor. (*Id.*). Defendants respond that Kallberg Tennessee did not remain in possession or control of the funds after they had transferred. (Doc. No. 70 at 17). To support this assertion, Defendants note that Defendants Matthew and Kathryn Kallberg did not at any time transfer funds back to Kallberg Tennessee. (Doc. No. 70 at 17). In its Reply, Plaintiff notes that "Defendants fail to address the fact that the transfers were all profit distributions, which means that Kallberg Tennessee retained control over the assets because at any time, the owners could have (and did) transfer money back. These were not transfers to the third parties."[24] (Doc. No. 72 at 3). Plaintiff does not explain why a company would necessarily retain control over assets after transfers to owners or why transfers back to a company would indicate some level of possession or control.  However, there is a genuine dispute of material fact regarding whether these distributions were profit distributions or compensation. (*Id.* at ¶ 68; Doc. No. 70 at ¶¶ 6-7).

Therefore, the Court finds that there is a genuine dispute of material fact as to whether this factor cuts in Plaintiff's favor.

2. Factor Three: Whether the Transfer or Obligation was Disclosed or Concealed

Regarding the third factor, Plaintiff argues that the transfers were not disclosed to Plaintiff, without citing any authority that indicates that this alleged fact is relevant to the analysis. (Doc. No. 59 at 15). Defendants respond that Plaintiff has misstated the law in this regard:

> This is an erroneous interpretation of the statute as it creates the absurd requirement that any person or entity must disclose to their creditors the nature of their business dealings at all times. This factor is relevant where a party transfers property and fails to record the sale, or otherwise avoids disclosure requirements.

---

[24] It is unclear whom Plaintiff means in referring to "the third parties."

Defendants here did nothing out of the ordinary with respect to the transfers of funds as all were identified on their respective bank account statements, they were not required to keep Plaintiff apprised of all their business dealings simply because they had entered into an agreement together. To imply fraudulent intent because Kallberg Industries did not do so would be erroneous.

(Doc. No. 70 at 17). In other words, Defendants dispute that there is any relevance to the (asserted) fact that Kallberg Tennessee did not disclose their transfers to *Plaintiff in particular*; Defendants appear to suggest that the issue instead is whether Kallberg Tennessee disclosed the transfers to anyone to whom it had some obligation to make disclosure. However, like Plaintiff, Defendants cite no authority supporting their position.

Because both parties have made legal arguments and have not explained their respective arguments (as to the relevance of non-disclosure to *Plaintiff*) with supporting case law, the Court finds that this factor is neutral because it is unclear whether non-disclosure to Plaintiff is of any relevance.

3. Factor Four: Whether, Before the Transfer was Made or the Obligation was Incurred, the Debtor had Been Sued or Threatened with Suit[25]

Plaintiff notes that in January 2018, before any of the transfers were made, Plaintiff demanded payment in a letter to "Kallberg Industries."[26] (Doc. No. 59 at 15-16). The letter included a demand for payment and return of equipment, and "clearly threatened suit." (*Id.*). Defendants respond that "[i]t must also be noted that Kallberg Industries itself filed the initial declaratory action in the Southern District of Florida for purposes of determining the exact amount owed to Plaintiff. Clearly Kallberg Industries lacked intent to 'defraud' Plaintiff where it

---

[25] Plaintiff asserts that Defendants do not dispute this factor. (Doc. No. 72 at 3). Though not enumerating, factor by factor, their discussion of the factors, it appears that Defendants intended the arguments referenced in this subsection to relate to the fourth factor.

[26] It is unclear whether this letter (Doc. No. 61-10) was intended for Kallberg Tennessee, Kallberg Florida, or both, or neither in particular. For what it is worth, the letter was sent to a Florida address.

concurrently filed an action in which the end result would be a determination that such a payment [in at least some amount] would be made." (Doc. No. 70 at 19). Though it is true that Kallberg Tennessee filed the action in Florida, Defendants do not argue that the letter did not threaten that a suit would be filed against "Kallberg Industries"—which is just as well, because in fact the letter certainly did.

Therefore, the Court finds that this factor weighs in favor of Plaintiff.

4. <u>Factor Five: Whether the Transfer was of Substantially All the Debtor's Assets</u>

Plaintiff asserts that this factor weighs in its favor because Kallberg Tennessee's bank account contained less than $10,000 on March 15, 2018 and at the end of March 2018. (Doc. No. 59 at 16). Defendants respond that cash in its bank account was not Kallberg Tennessee's only asset at the time of the transfers, as Kallberg Tennessee had generated significant receivables by way of the pass-through arrangement with Kallberg Florida. (Doc. No. 70 at 18). Plaintiff responds that since the receivables were not listed on Kallberg Tennessee's tax returns, they were too contingent to count as substantial assets. (Doc. No. 72 at 3). Therefore, as has been discussed, there exists a genuine dispute of material fact regarding the value of the receivables and the valuation of assets that Kallberg Tennessee possessed.

Therefore, the Court finds that there exists a genuine dispute of material fact as to whether this factor favors Plaintiff.

5. <u>Factors Six and Seven: The Debtor Absconded and the Debtor Removed or Concealed Assets</u>

Plaintiff cites *Orlowski v. Bates*, No. 2:11-CV-01396, 2015 WL 6159494, at *10 (W.D. Tenn. Oct. 20, 2015) for a general definition of "abscond": "To abscond, in a legal sense, means to hide, conceal, or absent oneself clandestinely, with the intent to avoid legal process." (Doc. No. 59 at 16). Plaintiff then argues that:

23

> Kallberg Tennessee, by making profit distributions to its members and insiders, absconded. At a time when Kallberg Tennessee knew that it owed a substantial debt to AEI, as soon as funds came in, Kallberg Tennessee transferred them to the Defendants. After AEI made its demand for payment in January 2018, rather than pay AEI and Kunkel the amounts owed, Kallberg Tennessee delayed payment, even after having received payment for utilization of the equipment and mechanics from the prime contractor.

(*Id.*). Plaintiff does not cite any further authority or explain why merely making a profit distribution is equivalent to absconding. Under Plaintiff's own proffered definition for absconding, it is not; whatever may be said about these transfers, Plaintiff has pointed to no evidence indicating that they involved Kallberg Tennessee (or, for that matter, any of its agents or any Defendants) hiding, concealing, or absenting itself (or himself or herself). Regarding concealing, Plaintiff similarly argues with no citation that by transferring its assets, Kallberg Tennessee necessarily concealed its assets. (*Id.* at 17).

Defendants respond that Kallberg Tennessee did not abscond with the funds or conceal assets.[27] Defendants also note that each individual Defendant testified that Kallberg Tennessee was able and willing to pay as necessary for the equipment. (Doc. No. 70 at 18-19). The Court has also previously discussed that there is a genuine dispute of material fact regarding whether the transfers were profit distributions or compensation. Therefore, the Court finds that there is a genuine dispute of material fact regarding whether these factors (six and seven) are present in this case.

---

[27] Defendants do not point to evidence tending to show that they did not abscond, but rather merely assert that there is no evidence that they did so. In certain summary judgment contexts, it is not sufficient for a non-movant merely to deny the existence of evidence supporting the other side; in such contexts, if the movant has come forward with evidence suggesting that certain events occurred, it is incumbent upon the non-movant to point to evidence suggesting the non-existence of those events. Here, however, Plaintiff never pointed to any evidence suggesting any "absconding" as Plaintiffs have defined it, so Defendants never had the obligation to point to evidence tending to refute that absconding occurred; that is, it was not required to disprove something the movant (Plaintiff) did nothing to prove in the first place.

24

In sum, the first, fourth, and tenth factors weigh in favor of Plaintiff. As to whether the second, fifth, sixth, seventh, eighth (discussed later in this opinion), and ninth (discussed later in this opinion) factors weigh in Plaintiff's favor, there exist outstanding genuine disputes of material facts. The third factor is neutral. The eleventh factor is irrelevant. Therefore, as only three factors weigh in favor of Plaintiff, the Court would not find that a sufficient number of factors weigh in favor of Plaintiff to shift the burden to Defendants to show the absence of a genuine issue of material fact as to whether, based specifically on the factors set forth in Tenn. Code Ann. § 66-3-305(b), transfers to Defendants were made "[w]ith actual intent to hinder, delay, or defraud" Plaintiff.

In summary, for the reasons discussed, the Court finds that it would be inappropriate to grant summary judgment to Plaintiff on Count I. Plaintiff shifted the burden to Defendants for purposes of summary judgment, and Defendants have sufficiently shown that there remains a genuine dispute of material fact as to whether (under either an analysis focusing more directly on the motivation of Kallberg Tennessee and the presence of an alternative reason for the transfers or an analysis focusing on the eleven statutory factors) the transfers at issue were made with the intent required for liability under Tenn. Code Ann. § 66-3-305(a)(1).

B. Tenn. Code Ann. § 66-3-305(a)(2)[28]

---

[28] Defendants argue that Tenn. Code Ann. § 66-3-305(a)(2) requires insolvency. (Doc. No. 70 at 10). However, the Court disagrees. *See In re Walker*, 566 B.R. 503, 541 (Bankr. E.D. Tenn. 2017) ("Tenn. Code Ann. § 66–3–305(a)(2) contains the same requirement for evidence of an insufficient exchange of value [as does Tenn. Code Ann. § 66-3-306(a)], *but rather than insolvency*, it requires a showing that the debtor '[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction,' or that the debtor '[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.'" (emphasis added)).

25

Plaintiff argues that Kallberg Tennessee did not receive anything of value for the transfers, the remaining assets were unreasonably small, and Kallberg Tennessee knew that it was incurring debts beyond its ability to pay as they came due.[29] (Doc. No. 59 at 21-22). Defendants argue that the transfers were made to compensate the individual Defendants for services performed on behalf of Kallberg Tennessee and that equivalent value is a question of fact not appropriate for summary judgment.[30] (Doc. No. 70 at 19).

As noted above, Tenn. Code Ann. § 66-3-305(a)(2) provides that:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

The statute further defines "equivalent value," explaining that:

> (a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

---

[29] The Court finds that this is sufficient to shift the burden to Defendants for purposes of summary judgment, with respect to Tenn. Code Ann. § 66-3-305(a)(2). Plaintiff has both pointed to evidence to support its position and indicated that it believes that Defendants cannot produce evidence to the contrary. (Doc. No. 59 at 21). Plaintiff states that "[t]he uncontradicted evidence establishes that the transfers were constructively fraudulent because Kallberg Tennessee did not receive any value in exchange for the transfers, the remaining assets were unreasonably small, and Kallberg Tennessee knew that it was incurring debts beyond its ability to pay as they became due." (*Id.*). Plaintiff supports this statement with evidence and also presents evidence that Kallberg Tennessee was incurring debts it could not pay as they became due.

[30] As previously noted, equivalent value is a factor to be considered under Tenn. Code Ann. § 66-3-305(b)(8).

(b) For the purposes of §§ 66-3-305(a)(2) and 66-3-306, a person gives a reasonably equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or disposition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.

(c) A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous.

Tenn. Code Ann. § 66-3-304.

"Whether Defendant received a reasonably equivalent value in exchange for the payments to her is a question of fact." *JRS Partners, GP v. Warren*, No. 3:17-CV-01258, 2021 WL 1143829, at *3 (M.D. Tenn. Mar. 25, 2021) (Richardson, J.) (citing *In re Wilkinson*, 196 F. App'x 337, 341 (6th Cir. 2006)); *see also In re Webb Mtn, LLC*, 420 B.R. 418, 433 (Bankr. E.D. Tenn. 2009), *aff'd*, No. 3:09-CV-559, 2010 WL 1544092 (E.D. Tenn. Apr. 19, 2010). "A court considering this question should first determine whether the debtor received any value in the exchange. If so, the court should determine if the value received was reasonably equivalent." *JRS Partners, GP*, 2021 WL 1143829, at *3 (footnote omitted).

Plaintiff maintains that the transfers were not made in exchange for a reasonably equivalent value, because the transfers were profit distributions. (Doc. No. 59 at 18). Plaintiff cites to case law indicating that profit distributions cannot be considered compensation (which is typically paid in exchange for something of value, *i.e.*, services performed on a job) as a matter of law, and that profit distributions cannot be given in exchange for reasonably equivalent value since the company receives nothing in return. (*Id.*). Defendants point out that Plaintiff has provided no binding authority for its proposition (citing only out-of-circuit cases) that profit distributions or dividends "generally cannot be considered compensation as a matter of law." (Doc. No. 70 at 20). Therefore, the Court is unpersuaded by Plaintiff's assertion that as a matter of law profit distributions cannot be considered compensation, and the Court finds that even if it did accept this assertion, there

27

would be a genuine dispute of material fact regarding whether the transfers at issue were profit distributions *or* compensation (though Plaintiff seems to characterize Defendants as arguing that the transfers were *both* profit distributions *and* compensation, and that therefore the law would require the payments to just be considered as profit distributions).

In the Memorandum in Support of the Motion, Plaintiff points to the following evidence: that Kallberg Tennessee's 2018 tax return designated the transfers as profit distributions, that one individual Defendant (Keith Kallberg) in his deposition referred to the transfers as profit distributions,[31] that some individual Defendants were separately compensated for services provided, that the transfers continued even after Kallberg Tennessee finished providing services and operating as a subcontractor, and that Defendant Lisa Kallberg received a Form K-1 for profit distributions despite not rendering services. (Doc. No. 59 at 19). However, Defendants maintain that the transfers were to compensate the individual Defendants for work done for Kallberg Tennessee and have presented supporting evidence in this regard. (Doc. No. 70 at 20).

Although Plaintiff shifted the burden on this issue, Defendants have met their resulting burden of showing a genuine dispute of material fact regarding whether there was an exchange for equivalent value. Thus, the Court finds that it cannot grant summary judgment to Plaintiff on Count II.

C.  Tenn. Code Ann. § 66-3-306

---

[31] Defendant Keith Kallberg answered "yes" to the question "[w]ere those profit distributions from Kallberg Tennessee to you?" But he thereafter gave an answer suggesting that he did not actually view the transfers as being what are appropriately considered mere profit distributions; he testified that the "purpose of the transfers" was for "[r]epayment for time, risk, contractual association, and work . . ." (Doc. No. 61-2 at 9). The following page of the deposition was not provided to the Court, so the full context of Defendant Keith Kallberg's answer regarding the "purpose of the transfers" is unknown.

28

Plaintiff asserts that Kallberg Tennessee was insolvent at all relevant times. (Doc. No. 59 at 22-24). Defendants disagree. (Doc. No. 70; Doc. No. 73 at ¶¶ 1, 2).

As the Court has suggested in a footnote above, insolvency is a requirement for Plaintiff's claims brought under Tenn. Code Ann. § 66-3-306.[32] Tenn. Code Ann. § 66-3-306 provides (emphasis added):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation *and the debtor was insolvent* at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, *the debtor was insolvent at that time*, and the insider had reasonable cause to believe that the debtor was insolvent.

Solvency is typically a question of fact. A court in this district has noted in the context of constructive fraud:

> Whether a debtor is insolvent at the time a contested transfer occurs or is thereby rendered insolvent is a question of fact which must be determined on a case-by-case basis. *Credit Managers Assn. of Southern California v. The Federal Co.*, 629 F. Supp. 175 (C.D.Cal.1985), citing *Wells Fargo Bank v. Desert View Building Supplies, Inc.*, 475 F. Supp. 693 (D.Nev.1978), *aff'd.*, 633 F.2d 225 (9th Cir.1980). Here, [the movants] assert that [the company] was not insolvent at the time the transfer/obligation occurred and, further, that [the company] was not rendered insolvent as a result of the subject transactions. Rather, they assert, other factors which were completely unrelated to the leveraged buyout; *i.e.*, the prevailing market conditions, caused the ultimate insolvency of, and Chapter 11 filing by, [the company]. [The movants] offer as supporting data for their assertions an Affidavit of [one of the movants] and a diagram of prices in the market during the relevant periods of time. Plaintiff [the non-movant] has submitted documentary evidence in support of its position that summary judgment is inappropriate at this time. Upon a review of the data, the Court determines that there remain questions of fact with regard to [the company's] solvency, which can only be resolved upon a trial of this cause.

---

[32] As previously noted, solvency is a factor to be considered under Tenn. Code Ann. § 66-3-305(b)(9).

29

*Matter of Ohio Corrugating Co.*, 70 B.R. 920, 927–28 (Bankr. N.D. Ohio 1987); *see also In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 803 (Bankr. S.D.N.Y. 2005) ("Solvency or insolvency is ordinarily a question of fact[.]"); *Citimortgage, Inc. v. Chicago Bancorp, Inc.*, No. 4:14CV01278 AGF, 2016 WL 3627284, at \*9 (E.D. Mo. July 6, 2016) (finding that "[t]he Court agrees with the [individual defendants] that the potential for the return of these underlying notes and collateral may have some contingent value that should be accounted for in determining Chicago Bancorp's [the primary corporate defendant's] solvency at the time of the transfers . . . a material question of fact remains as to the [primary corporate defendant's] solvency at the time" made summary judgment inappropriate); *Askanase v. Fatjo*, No. CIV. A. H-91-3140, 1993 WL 208440, at \*7 (S.D. Tex. Apr. 22, 1993) ("There also are outstanding questions of fact regarding LivingWell's [a company the plaintiff-trustee represented] solvency on January 13, 1987, including numerous, subordinate valuation issues. Accordingly, this Court RECOMMENDS that Plaintiff Askanase's motion for partial summary judgment be DENIED."), *report and recommendation adopted* (June 4, 1993), *aff'd*, 130 F.3d 657 (5th Cir. 1997).

Plaintiff asserts that Kallberg Tennessee was insolvent because 1) Kallberg Tennessee did not keep enough money in its bank account to cover Plaintiff's invoice, 2) Defendants are unaware of the assets and liabilities of Kallberg Tennessee at the time of transfers, and Kallberg Tennessee did not maintain adequate books and records, 3) Kallberg Tennessee was aware that it had an obligation to pay Plaintiff by January 2018, and 4) Kallberg Tennessee was unable to pay its debts as they became due because its assets were less than the sum of its liabilities. (Doc. No. 59 at 21-24). The Court finds that Plaintiff has properly shifted the burden for purposes of summary judgment to Defendants on the issue of insolvency, as it has identified evidence supporting its position, and it also made a colorable (rather than wholly conclusory) assertion that there is no

30

contrary evidence that Defendants can point to. (Doc. No. 59 at 23 ("As there are no records pertaining to the loans, repayments, and amounts due, Kallberg Tennessee cannot refute the conclusion that it was insolvent.")).

Defendants assert that there is a genuine dispute of material fact regarding whether Kallberg Tennessee was solvent, in light of Defendants' expert report.[33] (Doc. No. 70). Defendants summarize their expert report as refuting Plaintiff's arguments by stating:

> Defendants' Expert Report reflects the shortcomings involved with Plaintiff's analysis—it rests upon the presumption that Kallberg Industries must have recorded all accruals and receivables in its books to be considered an "asset" for purposes of determining insolvency. (Ex. 3, pp. 3-4). On the contrary, Defendants knew Kallberg Industries was owed amounts receivable from Kallberg Industries Florida and also possessed incurred but un-billed labor and use of equipment, both of which existed whether or not they were expressly recorded on Kallberg Industries' books and records. (*Id.*). Here, because the provision of services for the O&M Mission was to be a direct pass-through from Kallberg Industries Florida to Kallberg Industries, every invoice submitted by Kallberg Industries Florida to Louis Berger created an account receivable for the same amount on the books of both Kallberg Industries Florida and Kallberg Industries, regardless of whether they were formally recorded. (*Id.*).

(Doc. No. 70 at 11). As indicated in the background section, Defendants have also presented a chart reflecting the accounts receivable. (Doc. No. 70 at 13). Defendants also point to statements made by each of the individual Defendants in their depositions that Kallberg Tennessee was solvent. (*Id.* at 14-15).

Plaintiff responds that the expert opinion is wrong, because it ignores the tax returns that determined, for tax purposes, that the alleged receivables had zero value as of December 31, 2017. (Doc. No. 72 at 5). Despite Plaintiff's argument, the Court cannot weigh evidence on a motion for summary judgment, and the Court cannot resolve a dispute between expert opinions on summary

---

[33] The Court also notes that there are genuine disputes of material fact regarding Defendants' accounting practices, indicating that there are additionally still genuine disputes of material fact about the facts underlying the expert opinions. (Doc. No. 70 at 13-14).

judgment. A "battle of the experts" is a question left for the finder of fact. The Sixth Circuit has held that:

> This approach of weighing the credibility of the competing expert reports amounts to improper fact-finding. *See Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 449 (6th Cir. 2002). Indeed, competing expert opinions present the " 'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves." *Cadmus v. Aetna Casualty and Surety Co.*, 1996 WL 652769 (6th Cir. Nov.7, 1996) (unpublished) (citation omitted).
>
> The matter before the magistrate judge was a motion for summary judgment, not a trial, where credibility determinations are not appropriate.

*Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005); *see also Frausto v. Cooper Tire & Rubber Co.*, No. 3-12-0761, 2014 WL 581724, at *2 (M.D. Tenn. Feb. 13, 2014), *vacated sub nom. on other grounds Nieves Frausto v. Cooper Tire & Rubber Co.*, No. 3-12-0761, 2014 WL 12928244 (M.D. Tenn. Feb. 21, 2014) ("There is no requirement that Plaintiffs put forth the opinions of more than one expert in order to survive summary judgment . . . Defendant's expert may disagree, but that simply creates a 'battle of the experts' . . . those questions are left to the fact finder who will determine which witnesses to believe, in whole or in part."); *AmGuard Ins. Co. v. Fire Sys. of Michigan, Inc.*, No. 18-11952, 2019 WL 3456809, at *5 (E.D. Mich. July 31, 2019) ("The expert testimony of the parties' respective witnesses creates a triable issue of fact as to factual and proximate causation. Defendant's challenges to the testimony of Plaintiff's expert attack the weight of the expert's opinions, not their admissibility. Summary judgment is not appropriate because a jury must determine the proper weight to assign the competing expert opinions."), *reconsideration denied*, No. 18-11952, 2019 WL 4876453 (E.D. Mich. Aug. 20, 2019); *01 Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 151 F. Supp. 3d 778, 804 (N.D. Ohio 2015) ("Competing expert opinions in this case preclude summary judgment."). Therefore, the Court

cannot determine at this stage whether or not a particular expert is more credible or accurate than another expert.

Because there is a genuine dispute of material fact regarding whether Kallberg Tennessee was insolvent at the time of the transfers, the Court will not grant summary judgment to Plaintiff on Counts III and IV.

## **CONCLUSION**

For the reasons discussed above, Plaintiff's Motion (Doc. No. 58) will be denied.

An appropriate order will be entered.

_Eli Richardson_

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE